Jason S. Ritchie
Michael P. Manning
Bryan M. Kautz
RITCHIE MANNING KAUTZ PLLP
175 N. 27th St.
Suite 1206
Billings, MT 59101
Telephone: (406) 601-1400
Fax: (406) 545-0412
jritchie@rmkfirm.com
mmanning@rmkfirm.com
bkautz@rmkfirm.com

*Attorneys for Plaintiff*

CLERK OF THE
DISTRICT COURT
JERRY HALPIN

2021 JUN 16  P 3: 20

FILED

DEPUTY

## MONTANA THIRTEENTH JUDICIAL DISTRICT COURT
## YELLOWSTONE COUNTY

| | |
|---|---|
| ESTATE OF EDWARD R. CHAMPION, by and through Debbie Cellan, individually and as Personal Representative | Cause No.: DV-21-0134 |
| | Judge: Rod Souza |
| *Plaintiff,* | |
| v. | **AMENDED COMPLAINT AND JURY DEMAND** |
| BILLINGS SKILLED NURSING FACILITY, LLC D/B/A AVANTARA OF BILLINGS; LEGACY HEALTHCARE FINANCIAL SERVICES, LLC; CASCADE CAPITAL GROUP, LLC; SHAWNA JOHNSON; and JOHN DOES 1-25. | |
| *Defendants.* | |

**Exhibit A**

Plaintiff, the Estate of Edward R. Champion (the Estate), by and through counsel, states and alleges the following for its Amended Complaint against Defendants Billings Skilled Nursing Facility, LLC d/b/a Avantara of Billings (Avantara), Legacy Healthcare Financial Services, LLC (Legacy Healthcare), Cascade Capital Group, LLC (Cascade Capital), and Shawna Johnson:

## PARTIES, JURISIDICTION AND VENUE

1.      Edward R. Champion was an individual who formerly resided in Yellowstone County, Montana.  Specifically, Edward resided at Avantara, a skilled nursing facility in Billings, Montana, from April 10, 2020 until his death on September 13, 2020.

2.      Debbie Cellan is an individual residing in Yellowstone County, Montana.  She is Edward Champion's daughter and was appointed the personal representative of the Estate by the Montana Thirteenth Judicial District Court on November 19, 2020 in Probate No. DP 20-0362.

3.      Billings Skilled Nursing Facility, LLC d/b/a Avantara of Billings is a Montana limited liability company with its principal place of business in Skokie, Illinois.  Billings Skilled Nursing Facility, LLC does business under the assumed business name of Avantara of Billings.

4.      Legacy Healthcare is an Illinois limited liability company with its principal place of business in Skokie, Illinois.  Legacy Healthcare is the operator of Avantara.

1

5.    Cascade Capital is an Illinois limited liability company with its principal place of business in Skokie, Illinois.  Cascade Capital is the owner of Avantara.

6.    Shawna Johnson is an individual residing in Yellowstone County, Montana.  Johnson was a registered nurse at Avantara and provided care to Edward Champion during his time as a resident there, including, but not limited to, providing care on September 13, 2020.

7.    John Does 1-25 represent all entities or individuals who caused or contributed to the Estate's damages in any way, whose identities are currently unknown to the Estate.

8.    This Court has subject matter jurisdiction over this and all civil matters under Montana Constitution, Article VII, Section 4(1).

9.    This Court has personal jurisdiction over the parties in this case under Montana Rule of Civil Procedure 4(b) because the parties are either found within the State of Montana or the Estate's claims arise from the parties' transaction of business within Montana or the parties' commission of any act resulting in accrual within Montana of a tort action.

10.    Venue is appropriate in this Court under Mont. Code Ann. § 25-2-122(b), because the Defendants committed torts in Yellowstone County.

11.    The Estate exhausted the requirements of the Montana Medical Legal Panel Act (MMLPA), Mont. Code. Ann. § 27-6-101 et seq., as it pertains to Avantara.  The other Defendants are not subject to the requirements of the

MMLPA, but were named in the MMLPA proceedings as "Other Necessary and Proper Parties Not Designated Health Care Providers."

## GENERAL ALLEGATIONS

12.     The Estate incorporates by reference its allegations contained in Paragraphs Nos. 1-11 as if fully set forth herein.

13.     According to its website, Cascade Capital "is an independent, privately-held healthcare real estate investment and management company focused on acquiring underperforming/value-add skilled nursing, rehabilitation, post-acute, and transitional care facilities."

14.     Cascade Capital was launched in 2016 by the same leadership team that built Legacy Healthcare.  It represents that it "is rapidly growing its portfolio size and value" and bills itself as "among the most active independent skilled nursing facility investors" and as "experts in distressed assets/turnarounds." Cascade Capital advertises that owns more than 135 actively managed facilities in 23 states and has conducted "transactions on over $1 billion of real estate to date."

15.     In or about February 2018, Cascade Capital purchased two skilled nursing facilities in Montana as part of a $13.7 million transaction.  One of those skilled nursing facilities is Avantara and is located at 2115 Central Avenue in Billings, Montana.

16.     According to Cascade Capital's February 28, 2018 press release, Avantara is managed by Cascade Capital's "operating partner," Legacy Healthcare. Upon information and belief, the managers of Cascade Capital and the managers

3

Legacy Healthcare are the same two individuals—Menachem Shabat and Chaim Rajchenbach.

17.    Legacy Healthcare claims that it is "one of the country's leading providers of residential healthcare services." Legacy Healthcare currently services 60 facilities across 3 states, including Avantara.

18.    Edward Champion became a resident at Avantara on April 10, 2020. At the time, Edward was 71 years old and suffered from congenital deafness. He also had a history of depressive disorder and generalized anxiety.

19.    Due to Edward's deafness, he could not speak directly with Avantara's staff and, because the COVID-19 pandemic necessitated that staff wear masks, he was not able to read lips either. Edward's principal means of communication with both Avantara's staff was supposed to be a web-based device that allowed him to communicate via sign language with an interpreter on a TV screen and for the interpreter to then communicate directly with Avantara staff in his room.

20.    Because of Edward's deafness and the prohibition on visitors due to COVID-19, that communication device was also Edward's sole means of communicating with his family and anyone else outside of Avantara while he was at the facility.

21.    Avantara was well-aware of Edward's need for the communication device. Its records indicate that Edward's daughter informed the facility within three days of Edward's arrival that he had a webcam ready to be hooked up to his

4

TV. Edward's daughter also provided contact information so that Edward could have video calls with her.

22.     Nevertheless, Avantara inexplicably failed to set up Edward's communication device at any point during his time as a resident.  Likewise, Edward's Care Plan dated April 17, 2020 did not identify the device despite Avantara's knowledge that he needed it to communicate.

23.     Over the next few months, Edward's family repeatedly requested that his communication device be set up.  Edward's own handwritten notes also contain repeated references to the device and indicated that he wanted to leave if his "interpretation tv" was not made to work.  In response, staff members falsely told Edward that the device was not working or that the staff member did not know how to work it and that someone else would need to set it up.  During an investigation into Avantara by the Montana Department of Health and Human Services (DPHHS), an Avantara staff member admitted that the facility never installed the communication device so that Edward could communicate with his family or anyone else outside Avantara.

24.     Not surprisingly, Edward's Care Plan and other Avantara records indicate that Edward became easily agitated due to his difficulty communicating. But rather than setting up his communication device or taking other appropriate steps to address Edward's fundamental needs, Avantara sedated him for the first few weeks of his time as a resident.

5

25.     When Edward arrived at Avantara, he had a prescription for olanzapine, which is a mood stabilizer, but has a sedative effect when given on a regular basis.  Edward's prescription allowed olanzapine to be administered on an as-needed basis for agitation.  On at least five days in Edward's first two weeks at Avantara, however, staff administered olanzapine despite Edward's records revealing that he did not experience any episodes of agitation on those days.  Avantara also administered olanzapine at least once after Edward's doctor discontinued the prescription.

26.     Meanwhile, Edward's health and general condition deteriorated rapidly at Avantara.  He lost 11 pounds in his first month at the facility and received showers only twice per week despite that he sometimes wet himself.  His doctors also noted that he was unkempt during visits and that his usually friendly demeanor changed after moving to Avantara.

27.     Avantara also placed Edward in a room with a resident who screamed nearly constantly on the premise that the screaming would not bother Edward due to his deafness.  Indeed, staff consistently joked and laughed about it.

28.     Avantara identified Edward as a high fall risk in a Fall Care Plan dated April 15, 2020 and continued to do so in various Fall Risk Evaluation forms completed throughout his time as a resident.  Yet, Avantara took no documented measures to prevent or mitigate Edward's fall risk.

29.     Edward suffered a fall at Avantara on September 4, 2020 that required him to be transported to Billings Clinic.  Avantara' Falls Management Policy, as

6

amended in December 2019, required Avantara to take certain mandatory steps after a resident's fall, including a post-fall assessment, certain notifications, an investigation, immediate consultation with the resident's physician, and post-fall injury prevention.

30.    Following Edward's fall on September 4, 2020, Avantara performed only one of the required steps under its Falls Management Policy, performing a fall risk evaluation a full week later, on September 11, 2020.  That evaluation rated Edward as a 16 on a scale where anything above 8 indicated a high fall risk.  But despite that rating and its own policy, Avantara did not conduct the required investigation, did not consult with Edward's physician, and did not institute any post-fall injury prevention plan.

31.    While Edward was at Billings Clinic following his September 4, 2020 fall, he tested positive for COVID-19.  His condition was good enough, however, that Billings Clinic released him to return to Avantara on September 10, 2020.  When Billings Clinic released him, it did so with very specific orders.  In addition to implementing notification requirements for specific symptoms, Edward's physician, Dr. Irene Lohkamp, ordered that Avantara monitor his oxygen saturation three times every day.

32.    Due to extreme understaffing and woefully inadequate training, Avantara failed to provide even basic care for Edward following his return to the facility on September 10, 2020.  On that day, Avantara's COVID-19 unit was staffed by a single certified nursing assistant (CNA) covering eleven patients by herself for

more than five hours.  Specifically, the on-duty nurse left about 10:00 a.m. and another did not arrive until 3:00 p.m.  During that time, the CNA on duty made multiple phone calls and sent text messages to another staff member asking when a nurse would arrive.  The only answer she received was, "soon."  Consequently, when Edward returned from Billings Clinic at 11:45 a.m., Avantara did not have anyone available to set up his oxygen or to receive a report from the ambulance crew who performed the transfer.  The CNA attempted to get help, but nobody came to assist her.

33.     Avantara also failed to follow Dr. Lohkamp's orders.  Avantara's records reveal that it first checked Edward's oxygen saturation on September 10, 2020 at 7:01 p.m., more than seven hours after he returned from Billings Clinic.  It next checked his oxygen saturation at 9:17 p.m. for the second and last time that day.  Then, Avantara did not check Edward's oxygen saturation again for nearly 11 hours, and only then after he experienced another fall.

34.     On the morning of September 11, 2020, Avantara allowed Edward to walk by himself to the bathroom with no assistance.  At approximately 8:00 a.m., a CNA found Edward on his back next to the toilet.  Edward indicated that he had hit his head and pointed to the left side of his face.  Although it was immediately apparent that Edward was injured, Avantara waited for more than an hour before calling an ambulance at 9:25 a.m. to transport him to Billings Clinic.

35.     All the while, Avantara failed to notify Edward's family about his status.  At 12:37 p.m. on September 11, 2020, Avantara called Edward's daughter,

8

not to inform her about her father's fall, but to tell her that additional staff and residents had tested positive for COVID-19.  At that point, she did not even know that Edward had returned from Billings Clinic the previous day, much less than he had been taken back by ambulance three hours earlier.  She found out only because she asked about Edward's status when Avantara called her for an unrelated reason.

36.   At Billings Clinic, doctors performed a head scan on Edward, which was negative but revealed a fracture of his C-5 vertebrae of indeterminate age. Sometime after 4:00 p.m. that day, Billings Clinic released Edward to return to Avantara.  Again, Avantara ignored its own Falls Management Policy.  It did not complete a fall assessment, perform any investigation into Edward's fall on the morning of September 11, 2020, consult with his physician, or implement any fall prevention measures.

37.   Avantara also again ignored critical orders from Edward's physicians about monitoring his vital signs.  When Edward returned from Billings Clinic on September 11, 2020, Dr. Lohkamp ordered Avantara to monitor Edward every four hours for vital signs—temperature, respiratory rate, pulse, oxygen saturation, and blood pressure—and other COVID-19 symptoms.  If Edward had any elevated temperature or new or worsening respiratory symptoms, Avantara was to call the on-call doctor immediately.

38.   When Edward was readmitted to Avantara on September 11, 2020, his oxygen saturation was 95% while on 5 liters per minute of oxygen.

9

39.     Avantara first measured Edward's oxygen at 8:00 p.m. on September 11, 2020—about four hours after his return from Billings Clinic.  At that point, Edward's oxygen saturation was 91% while receiving oxygen via a nasal cannula.  Notwithstanding that the reading—which bears directly on respiratory function— was significantly worse than when he returned to the facility that afternoon, Avantara did not call the on-call doctor as Dr. Lohkamp ordered.

40.     Avantara did not measure any of Edward's other vital signs at 8:00 p.m. despite Dr. Lohkamp's orders to do so every four hours.  Instead, it first measured all his vital signs at 10:30 p.m. on September 11, 2020—some six and a half hours after he returned from Billings Clinic.  At that point, his blood pressure had increased somewhat and his oxygen saturation was 93% while receiving oxygen via a nasal cannula, still worse than when he returned from Billings Clinic at 4:00 p.m.  Still, Avantara did not call the on-call doctor.

41.     At 12:18 p.m. on September 12, 2020, Avantara measured all of Edward's vital signs again.  Those readings demonstrated some improvement over the course of the previous two hours, but Edward's oxygen saturation was still at 94%, which was lower than when he arrived back from Billings Clinic.  Nevertheless, Avantara removed his nasal oxygen sometime between the 10:30 p.m. reading on September 11, 2020 and the 12:18 a.m. reading on September 12, 2020, and did not call the on-call doctor.

42.     After the 12:18 a.m. vital sign reading, Avantara did not check any of Edward's vital signs again until measuring his oxygen saturation at 8:11 a.m. on

10

September 12, 2020—eight hours later. By then, Edward was back on nasal oxygen and his saturation level had deteriorated substantially to 90%. Again, Avantara did not call the on-call doctor or take any other action.

43.     At 8:09 p.m. on September 12, 2020, Avantara measured all of Edward's vital signs for the first time in 20 hours. Those measurements revealed improvement. Specifically, Edward's oxygen saturation was up to 95% without oxygen and his other results were the best since he had returned from Billings Clinic. When Avantara filled them into its Administration Record Report, however, it did not just do so for the 8:00 p.m. entry on September 12, 2020. Rather, it fraudulently backfilled the 8:00 p.m. measurements to reflect that Edward had recorded precisely the same blood pressure, pulse, respiratory rate, oxygen saturation, and temperature at 4:00 a.m., 8:00 a.m., 12:00 p.m., 4:00 p.m., and 8:00 p.m. that day. That record is inconsistent with the Weights and Vitals Summary in Edward's records, which reveals that Avantara failed to monitor and record Edward's vital signs every four hours on September 12, 2020, particularly given that Edward's oxygen saturation was measured at 8:11 a.m. on September 12, 2020 at 90%, yet is reported at 95% in Avantara's Administration Record Report.

44.     Early in the morning of September 13, 2020, Edward's condition took a dramatic turn for the worse. Avantara measured his vital signs at 1:32 a.m. and discovered that his blood pressure was low, his pulse was high and irregular, his respiratory rate had increased substantially, his oxygen saturation had dropped to 90%, and he had a 102.4-degree fever.

11

45.     Despite that Edward was in obvious and severe respiratory distress, Avantara inexplicably did nothing. The staff member on duty at the time told DPHHS investigators that she did not call the on-call doctor as Dr. Lohkamp had ordered. Nor did she notify a nurse supervisor.

46.     From there, Avantara and Johnson did virtually nothing while Edward died over the course of the next ten hours. To start, Avantara and Johnson took no action whatsoever for five hours after learning that Edward was in severe respiratory distress and had a fever and other worsening vital signs at 1:32 a.m. on September 13, 2020.

47.     At approximately 6:30 a.m. on September 13, 2020, a CNA came on duty at Avantara and was immediately instructed by Johnson to take Edward's vital signs because he had just been found on the floor. This fall is not documented in Avantara's records and Avantara and Johnson did not notify the on-call doctor. When the CNA went to Edward's room, she discovered him face down on his bed, shaking and struggling to breathe. She repositioned him on his back and recalled to a DPHHS investigator that he had a temperature over 102 and labored respirations. The CNA reported giving Johnson a piece of paper containing Edward's vital signs, but the only vital sign recorded in Avantara's records for that time frame is an oxygen saturation level of 90% on room air at 7:04 a.m.

48.     After 6:30 a.m. on September 10, 2020, Edward fell at least three more times over the next few hours. The final time, a CNA found Edward at the foot of his bed and staff struggled to get him back into bed. The CNA and Johnson gave

somewhat conflicting accounts to state investigators. The CNA reported that Edward died on the floor while waiting for Johnson to retrieve a Hoyer lift to get him back in bed. Johnson, on the other hand, claimed that she and the CNA were able to get Edward back in bed and that he died immediately upon getting in bed. Both agree that that Johnson assessed Edward and confirmed that he died shortly following his final fall near his bed.

49.     At no time during any of this ordeal did Johnson or Avantara's staff call 9-1-1 or otherwise seek professional assistance. They did, however, call both of Edward's daughters—at 10:18 a.m. and 10:20 a.m., respectively—to see if his daughters—neither of whom are medical professionals or were present to observe Edward's condition—thought they should call 9-1-1. Avantara then called one of Edward's daughters back at 10:31 a.m. to notify her of Edward's death.

50.     At 8:00 p.m. on September 13, 2020, Legacy Healthcare's general counsel, Eli Rosenblum, called Edward's daughter to convey his view that Edward's death was due to Billings Clinic releasing him to return to Avantara too soon.

51.     On September 24, 2020, Edward's daughter initiated a complaint with DPHHS, which subsequently investigated and performed: (a) a COVID-19 Emergency Preparedness abbreviated survey on September 25, 2020; (b) a Complaint survey on September 25, 2020; and (c) a COVID-19 Focused Infection Control survey on September 30, 2020.

52.     The survey resulted in a finding of an "Immediate Jeopardy" situation due to deficiencies in Edward's care. The Centers for Medicare and Medicaid

13

Services (CMS) assign an "immediate jeopardy" rating when there is a "situation in which [a] provider's noncompliance . . . is likely to cause serious injury, harm, impairment, or death to a resident." The survey also identified that Avantara failed to comply with numerous federal requirements imposed on skilled nursing facilities who participate in Medicare with respect to both Edward's care and the care of numerous other residents.

**FIRST CAUSE OF ACTION**
**(Negligent Care – Against All Defendants)**

53.     The Estate incorporates by reference the allegations set forth in Paragraphs 1 through 52 of this Amended Complaint.

54.     Defendants owed Edward Champion a duty to provide him with skilled nursing care, supervision, and to care for his general health and safety.

55.     Defendants Avantara, Legacy Healthcare, and Cascade Capital breached their duties of care to Edward by any and all of the following: (a) failing to set up his web-based communication device or otherwise facilitate a means of communication for Edward; (b) failing to bathe him regularly; (c) medicating him unnecessarily; (d) placing him in a room with a resident who screamed constantly; (e) failing to implement appropriate measures to prevent or mitigate Edward's fall risk; (f) failing to follow their own fall-related policies following Edward's falls; (g) abusing, neglecting, or otherwise failing to provide adequate care for Edward during his time as a resident at Avantara, including, but not limited to, failing to provide adequate care for Edward following his returns from Billings Clinic on September 10, 2020 and September 11, 2020; (h) ignoring Edward's doctors' orders;

14

(i) failing to adequately communicate with Edward's family or other representatives; and (j) failing to adhere to state and federal guidelines.

56.     Defendant Shawna Johnson personally breached her duty of care to Edward by abusing, neglecting, or otherwise failing to provide competent care to Edward as a registered nurse including, but not limited to, failing to provide adequate care to Edward on September 13, 2020.

57.     Defendants acted with actual malice, as defined in Mont. Code Ann. § 27-1-221(2), because they had knowledge of facts or intentionally disregarded facts that created a high probability of injury to Edward, and they either deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to Edward or deliberately proceeded to act with indifference to the high probability of injury to Edward.  As such, the Estate is entitled to punitive damages.

58.     Defendants acted with actual fraud, as defined in Mont. Code Ann. § 27-1-221(3), because they made a representation with knowledge of its falsity, or they concealed a material fact with the purpose of depriving Edward of property or legal rights or otherwise causing him injury.  Edward and his family were justified in relying on Defendants' representations.  As such, the Estate is entitled to punitive damages.

59.     The Estate suffered injuries and damages, including for survival and wrongful death, as a direct and proximate cause of Defendants' negligence.

## SECOND CAUSE OF ACTION
### (Negligent Management – Against Avantara, Legacy Healthcare, and Cascade Capital)

60.     The Estate incorporates by reference the allegations set forth in

15

Paragraphs 1 through 59 of this Amended Complaint.

61.     Cascade Capital is a for-profit investment company that touts its ability to acquire and maximize the value of skilled nursing facilities, as well as its rapidly growing portfolio size. Among other things, Cascade Capital advertises that it was launched by the same leadership team that built Legacy Healthcare and that its familiarity with skilled nursing facilities allows it to identify early indicators of financial performance that it then uses to improve its portfolio management.

62.     Legacy Healthcare is Cascade Capital's operating partner and, according to Secretary of State filings in Illinois, its registered managers are the same two individuals who are the registered managers of Cascade Capital. Legacy Healthcare's principal office address is also the same as Cascade Capital's principal office address.

63.     Avantara is part of Cascade Capital's asset portfolio and is operated by Legacy Healthcare. Avantara is an assumed business name of Billings Skilled Nursing Facility, LLC. Billings Skilled Nursing Facility, LLC is a Montana limited liability company, but shares the same principal office address as Legacy Healthcare and Cascade Capital in Skokie, IL.

64.     Avantara, Cascade Capital, and Legacy Healthcare had a duty to Edward Champion and other residents at Avantara to make reasonable non-medical business and management decisions that would not jeopardize their care or their general health and safety.

16

65.    Avantara, Cascade Capital, and Legacy Healthcare breached that duty by making and executing non-medical business and management decisions with the motivation of reducing the cost of operating Avantara and/or maximizing Avantara's value to Cascade Capital's portfolio at the expense of patient care and safety.

66.    These non-medical business and management decisions included, but are not limited to:  (a) operating Avantara via an Illinois-based entity managed by the same individuals as Cascade Capital with no physical presence in Montana and no previous experience operating a skilled nursing facility in Montana; (b) failing to adequately staff and/or supply Avantara; (c) failing to adequately train staff at Avantara; and (d) failing to adequately supervise staff at Avantara.

67.    Avantara, Cascade Capital, and Legacy Healthcare knew or should have known that their non-medical business and management decisions created sub-standard conditions and care at Avantara.  They acted with actual malice, as defined in Mont. Code Ann. § 27-1-221(2), because they had knowledge of facts or intentionally disregarded facts that created a high probability of injury to Edward and other residents, and they either deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to Edward and other residents or deliberately proceeded to act with indifference to the high probability of injury to Edward and other residents.  As such, the Estate is entitled to punitive damages. Avantara, Cascade Capital, and Legacy Healthcare acted with actual fraud, as defined in Mont. Code Ann. § 27-1-221(3), because they made a representation with

knowledge of its falsity, or they concealed a material fact with the purpose of depriving Edward of property or legal rights or otherwise causing him injury. Edward and his family were justified in relying on Avantara's, Cascade Capital's and Legacy Healthcare's representations.  As such, the Estate is entitled to punitive damages.

68.     The Estate suffered injuries and damages, including for survival and wrongful death, as a direct and proximate cause of Avantara's, Cascade Capital's, and Legacy Healthcare's negligence with respect to non-medical business and management decisions.

### THIRD CAUSE OF ACTION
### (Negligence *Per Se*–Against all Defendants)

69.     The Estate incorporates by reference the allegations set forth in Paragraphs 1 through 68 of this Amended Complaint.

70.     The Defendants owed Edward Champion a duty to comply with the Montana Elder and Persons with Developmental Disabilities Abuse Prevention Act, Mont. Code Ann. § 52-3-801, *et seq.*, and the federal public health regulations set forth in 42 C.F.R. Subpart B.

71.     The Defendants breached their duty to Edward by not complying with the state and federal laws and regulations identified in Paragraph 70.

72.     The state and federal laws and regulations identified in Paragraph 70 were enacted to prevent the abuse and neglect of elderly persons and persons with developmental disabilities.  Edward Champion was a member of that protected class.

18

73.     The Estate suffered injuries and damages, including for survival and wrongful death, as a direct and proximate result of Defendants' negligence *per se*, and their injuries were of the sort which the state and federal laws and regulations identified in Paragraph 70 were enacted to prevent.

74.     Defendants acted with actual malice, as defined in Mont. Code Ann. § 27-1-221(2), because they had knowledge of facts or intentionally disregarded facts that created a high probability of injury to Edward, and they either deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to Edward or deliberately proceeded to act with indifference to the high probability of injury to Edward.  As such, the Estate is entitled to punitive damages.

75.     Defendants acted with actual fraud, as defined in Mont. Code Ann. § 27-1-221(3), because they made a representation with knowledge of its falsity, or they concealed a material fact with the purpose of depriving Edward of property or legal rights or otherwise causing him injury.  Edward and his family were justified in relying on Defendants' representations. As such, the Estate is entitled to punitive damages.

## FOURTH CAUSE OF ACTION
### (Negligent Misrepresentation – Against Avantara, Legacy Healthcare, and Cascade Capital)

76.     The Estate incorporates by reference the allegations set forth in Paragraphs 1 through 75 of this Amended Complaint.

77.     Avantara, Legacy Healthcare, and Cascade Capital repeatedly represented to Edward Champion and his family that it provided state-of-the-art healthcare, that its values and mission are centered around improving the lives of

19

its residents, that it had a high standard of quality of care, and that it maintained the highest standards of care.

78.     Avantara and Legacy Healthcare also repeatedly represented to Edward and his family that his communication device was not working or would be set up shortly.

79.     Cascade Capital represented that their executive leadership group are all experts in their field and share a commitment to industry best practices.

80.     Avantara, Legacy Healthcare, and Cascade Capital made those representations to influence Edward's and his family's decision first about whether Edward should become a resident of Avantara, and then their decision about whether he should remain a resident of Avantara.

81.     Avantara's, Legacy Healthcare's, and Cascade Capital's representations were untrue and the representations without any reasonable ground for believing them to be true.

82.     Edward and his family were justified in relying on Avantara's, Legacy Healthcare's, and Cascade Capital's representations.

83.     As a direct and proximate cause of Avantara's, Legacy Healthcare's, and Cascade Capital's negligent misrepresentations, the Estate suffered injuries and damages.

84.     Avantara, Legacy Healthcare, and Cascade Capital acted with actual malice, as defined in Mont. Code Ann. § 27-1-221(2), because they had knowledge of facts or intentionally disregarded facts that created a high probability of injury to

Edward, and they either deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to Edward or deliberately proceeded to act with indifference to the high probability of injury to Edward. As such, the Estate is entitled to punitive damages.

85.     Avantara, Legacy Healthcare, and Cascade Capital acted with actual fraud, as defined in Mont. Code Ann. § 27-1-221(3), because they made a representation with knowledge of its falsity, or they concealed a material fact with the purpose of depriving Edward of property or legal rights or otherwise causing him injury. Edward and his family were justified in relying on Avantara's, Legacy Healthcare's, and Cascade Capital's representations. As such, the Estate is entitled to punitive damages.

## FIFTH CAUSE OF ACTION
### (Violation of the Montana Consumer Protection Act – Against Avantara, Legacy Healthcare, and Cascade Capital)

86.     The Estate incorporates by reference the allegations set forth in Paragraphs 1 through 85 of this Amended Complaint.

87.     The Montana Unfair Trade Practices and Consumer Protection Act of 1973, Mont. Code Ann. § 30-14-101, *et seq.* (MCPA), prohibits unfair or deceptive acts or practices in the conduct of any trade or commerce.

88.     Edward Champion was a consumer under the MCPA.

89.     Avantara, Legacy Healthcare, and Cascade Capital engaged in unfair or deceptive acts and practices in the conduct of their commerce or trade, including, but not limited to:  (a) misrepresenting to Edward and his family the scope of Avantara's, Legacy Healthcare's, and Cascade Capital's abilities and services; and

(b) making non-medical business and management decisions that knowingly imperiled Edward's safety, health and welfare without disclosing those business decisions, the dangerous conditions created by those decisions, or past instances in which those decisions resulted in sub-standard care to other residents.

90.     As a direct and proximate cause of Avantara's, Legacy Healthcare's, and Cascade Capital's unfair or deceptive acts and practices, the Estate suffered injuries and damages.

## SIXTH CAUSE OF ACTION
### (Wrongful Death and Survival – Against All Defendants)

91.     The Estate incorporates by reference the allegations set forth in Paragraphs 1 through 90 of this Amended Complaint.

92.     As a direct and proximate result of the actions and inactions of the Defendants as alleged above, Edward was neglected, abused, and/or received substandard care resulting in his death.  Prior to his death, the Defendants actions and inactions caused Edward additional damages, including emotional distress and pain and suffering.  Edward's heirs have suffered loss of consortium, comfort, care, support, society, and companionship of their deceased loved one and have incurred damages as a result.

93.     Defendants acted with actual malice, as defined in Mont. Code Ann. § 27-1-221(2), because they had knowledge of facts or intentionally disregarded facts that created a high probability of injury to Edward, and they either deliberately proceeded to act in conscious or intentional disregard of the high probability of

22

injury to Edward or deliberately proceeded to act with indifference to the high probability of injury to Edward.  As such, the Estate is entitled to punitive damages.

94.      Defendants acted with actual fraud, as defined in Mont. Code Ann. § 27-1-221(3), because they made a representation with knowledge of its falsity, or they concealed a material fact with the purpose of depriving Edward of property or legal rights or otherwise causing him injury.  Edward and his family were justified in relying on Defendants' representations.  As such, the Estate is entitled to punitive damages.

**SEVENTH CAUSE OF ACTION**
**(Unjust Enrichment – Against Avantara, Legacy Healthcare,**
**and Cascade Capital)**

95.      The Estate incorporates by reference the allegations set forth in Paragraphs 1 through 94 of this Amended Complaint.

96.      During his time as a resident at Avantara, Edward Champion conferred a financial benefit on Avantara, Legacy Healthcare, as the operator of Avantara, and Cascade Capital, as the owner of Avantara, by paying monthly rents and any other fees and expenses associated with his residency at Avantara.

97.      Avantara, Legacy Healthcare, and Cascade Capital were aware of and/or appreciated the benefit conferred on them by Edward.  Indeed, Avantara's, Legacy Healthcare's, and Cascade Capital's business model is fundamentally premised on making profit from the operation and ownership of skilled nursing facilities.

23

98.    Given the actions and inactions of Avantara, Legacy Healthcare, and Cascade Capital alleged above, their acceptance and retention of the benefit conferred by Edward would be inequitable without payment of its value.

99.    Accordingly, Avantara, Legacy Healthcare, and Cascade Capital have been unjustly enriched and should be required to pay the Estate the value of the benefit conferred on them by Edward.

**EIGHTH CAUSE OF ACTION**
**(Conspiracy – Against Avantara, Legacy Healthcare, and Cascade Capital)**

100.    The Estate incorporates by reference the allegations set forth in Paragraphs 1 through 99 of this Amended Complaint.

101.    Acting in concert, Avantara, Legacy Healthcare, and Cascade Capital conspired to unjustly enrich themselves by underfunding and understaffing Avantara, and/or by failing to take corrective action despite knowing of substandard care and conditions at Avantara.

102.    The object of Avantara's, Legacy Healthcare's, and Cascade Capital's conspiracy was to reduce the cost of operating Avantara to increase financial returns from the business, despite their conduct resulting in inadequate care to Edward Champion and other residents.

103.    Upon information and belief, insufficient income from the operation of Legacy Healthcare, Cascade Capital, and Avantara was not directed toward the reasonable and proper operation of Avantara, and was instead channeled, directly or indirectly, to Cascade Capital, Legacy Healthcare, and those entities members and managers, at least some of whom overlapped.

24

104.   Avantara, Legacy Healthcare, and Cascade Capital had a meeting of the minds regarding their conspiracy.

105.   Avantara, Legacy Healthcare, and Cascade Capital took one or more unlawful overt acts in furtherance of such conspiracy.

106.   As a direct and proximate result of Avantara's, Legacy Healthcare's, and Cascade Capital's conspiracy, the Estate suffered injuries and damages.

107.   Avantara, Legacy Healthcare, and Cascade Capital acted with actual malice, as defined in Mont. Code Ann. § 27-1-221(2), because they had knowledge of facts or intentionally disregarded facts that created a high probability of injury to Edward, and they either deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to Edward or deliberately proceeded to act with indifference to the high probability of injury to Edward.  As such, the Estate is entitled to punitive damages.

108.   Avantara, Legacy Healthcare, and Cascade Capital acted with actual fraud, as defined in Mont. Code Ann. § 27-1-221(3), because they made a representation with knowledge of its falsity, or they concealed a material fact with the purpose of depriving Edward of property or legal rights or otherwise causing him injury.  Edward and his family were justified in relying on Avantara's, Legacy Healthcare's, and Cascade Capital's representations.  As such, the Estate is entitled to punitive damages.

25

## REQUEST FOR JURY TRIAL

Pursuant to Rule 38(b) of the Montana Rules of Civil Procedure, the Estate respectfully demands a trial by jury on all claims and issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, the Estate prays for judgment against Defendants as follows:

1. For judgment in favor of the Estate and against Defendants;

2. For compensatory damages in an amount to be proven at trial, including, but not limited to, wrongful death and survival damages;

3. For consequential damages;

4. For treble damages and attorneys' fees under Mont. Code Ann. § 30-14-101, *et seq.*

5. For punitive and exemplary damages;

6. For costs, interest, and pre-judgment interest as determined by the Court; and

7. For such other and further relief that this Court deems just and proper.

Dated:  June 16, 2021

Jason S. Ritchie
RITCHIE MANNING KAUTZ PLLP
175 N. 27th Street
Suite 1206
Billings, MT 59101

*Attorneys for Plaintiff*

26